UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| ANTHONY W. PENN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:13CV33 ACL |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Anthony W. Penn's

applications for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*, and for supplemental security income

(SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* All matters are

pending before the undersigned United States Magistrate Judge, with consent of

the parties, pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the

Commissioner's decision is reversed.

### I. Procedural History

Plaintiff Anthony W. Penn applied for SSI in March and May 2011,

claiming that he became disabled on June 1, 2009. (Tr. 154-58, 164-70.) In his

application for DIB, filed in March 2011, plaintiff claimed he became disabled on

July 1, 2009.  (Tr. 159-63.)  Plaintiff subsequently amended his alleged onset date to February 16, 2010.  (Tr. 184.)  Plaintiff claimed that he was disabled and limited in his ability to work, because of back injury/arthritis, degenerative disc disease, chronic obstructive pulmonary disease, depression, methicillin-resistant staphylococcus aureus (MRSA) staph infection, headaches, chronic bronchitis, memory loss, compression fracture at L3, bulging discs, right sided sciatica, hepatitis C, and abdominal pain.  (Tr. 194.)  On May 11, 2011, the Social Security Administration denied plaintiff's claims for benefits.  (Tr. 81-84, 87-93.)  Upon plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on April 4, 2012, at which plaintiff and a vocational expert testified.  (Tr. 27-67.) On May 8, 2012, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform his past relevant work as a janitor and assembler. (Tr. 6-22.)  On January 29, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-4.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ erred by according little weight to the opinion of his treating physician, Dr. Cramp.  Plaintiff requests that the matter be reversed and remanded to the Commissioner for an award of benefits, or for further proceedings.

## II.  Testimonial Evidence Before the ALJ

A.    <u>Plaintiff's Testimony</u>

At the administrative hearing on April 4, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-eight years of age.  Plaintiff completed the ninth grade and did not receive his GED.  Plaintiff stands five feet, ten inches tall and weighs 240 pounds.  (Tr. 35-36.)  Plaintiff lives in a mobile home with his girlfriend and his eighteen-year-old son.  Plaintiff also has a fourteen-year-old daughter who lives nearby with an aunt and uncle.  (Tr. 33-34.) Plaintiff received unemployment benefits from early 2009 to April 2010.  (Tr. 37.)

Plaintiff's Work History Report shows that plaintiff worked as a shoe builder from 1988 to 1989 and as a builder in a pallet factory from 1989 to 1990. From 1995 to 1997, plaintiff worked as a laborer at a tree farm.  From 1998 to 2000, plaintiff worked intermittently as a mechanic at an automotive repair shop. From 1999 to 2000, plaintiff worked as an assembler at a factory.  From January to June 2006, plaintiff worked as a janitor at a nursing home.  From 2006 to June 2009, plaintiff worked as a supervisor in custom cabinet making.  (Tr. 206.) Plaintiff testified that he was "let go" from this last job, because he was missing work on account of his back condition and the treatment he was receiving for hepatitis C.  Plaintiff testified that his boss decided to let him go so he could

receive unemployment compensation. Plaintiff testified that he never tried to return to this work nor has he looked for work since February 2010. (Tr. 36-38.)

Plaintiff testified that he is unable to work, because of pain in his low back that radiates to his legs. Plaintiff testified that he broke his back in 2002, but was not bothered by it until 2007. (Tr. 38-39.) Plaintiff testified that he took medication in order to go to work, but eventually experienced too much pain, took too much medication, and could no longer work. Plaintiff testified that he no longer lifts things or mows the yard, because of the pain and that the pain worsens with moving the wrong way, sleeping in the wrong position, and reaching down. Plaintiff testified that, for two or three years, he has experienced pain every day at a level nine on a scale of one to ten. Plaintiff testified that the pain improves when he lies down and lowers to a level seven with medication. (Tr. 39-41.) Epidural steroid injections provide temporary relief. Plaintiff testified that his doctor told him in 2010 that he was disabled and should not engage in any lifting. (Tr. 42-43.)

Plaintiff testified that he also experiences intermittent abdominal pain every day, which is at a level six with pain medication. Plaintiff testified that testing showed him to have ulcers and a hiatal hernia. (Tr. 38, 44-45.)

Plaintiff testified that he is depressed, because he can no longer do the things he used to do. Plaintiff testified that he has crying spells twice a month, as well as difficulty with concentration. Plaintiff testified that he sometimes wants to "give

up," but will not because of his children.  (Tr. 57-58.)

Plaintiff testified that he takes medication for pain, depression, inflammation, muscle spasms, and liver function; he also takes ibuprofen for headaches.  Plaintiff testified that he experiences constipation, nervousness, and an inability to concentrate as side effects from his medication but that he does not pay attention to them.  (Tr. 42-43, 56-57.)

Plaintiff testified that treatment for hepatitis C affected his mind and his memory, and he feels that he has not recovered from it.  Plaintiff testified that the virus is no longer detected in blood tests, but he continues to experience pain in the liver area.  (Tr. 45-46.)

Plaintiff testified that he also has chronic bronchitis for which he takes antibiotics and a heart condition for which he wore a holter monitor for diagnosis. Plaintiff testified that his doctor suggested that he take heart medication, but he determined to wait until the condition worsens.  (Tr. 46-47.)

As to his exertional abilities, plaintiff testified that he can sit for thirty minutes at one time and for a total of up to two-and-a-half hours in an eight-hour day.  Plaintiff testified that he can stand for forty-five minutes to an hour at one time and for a total of up to two hours in an eight-hour day.  Plaintiff testified that he can walk up to three blocks and comfortably lift five pounds.  Plaintiff testified that he sometimes drops things, because of occasional numbness in his hands.  (Tr.

52-53.)

As to his daily activities, plaintiff testified that he gets up in the morning at 9:00 a.m. and prepares some instant coffee.  Plaintiff testified that he then sits in a soft chair for two to three hours.  Plaintiff testified that it takes him that long to wake up, because he has no motivation or energy.  Plaintiff cooks meals once or twice a week and performs housework at his own pace, such as cleaning the counter and washing dishes, taking breaks while doing so.  Plaintiff does laundry once a week without difficulty.  Plaintiff testified that he can button and zip his pants, but his balance problems make it difficult to put them on.  Plaintiff also has difficulty bathing due to problems with balance and bending over.  (Tr. 47-48, 52.) Plaintiff testified that he does not shop because of lack of money, but he accompanies his girlfriend to the grocery store.  Plaintiff testified that he sometimes sits in the car while his girlfriend shops, because he has difficulty walking around and pushing carts.  (Tr. 49.)  Plaintiff testified that he likes to fish, but had not gone fishing this year because of leg pain.  Plaintiff watches movies and football, but must change positions between standing and sitting while doing so.  Plaintiff testified that his family lives nearby and that he visits with them four days a week.  Plaintiff does not attend church or belong to any social groups.  (Tr. 50-51.)

Plaintiff testified to a history of illicit drug use and related behavior, but

further testified that he underwent treatment in January 2010 and last used such substances in February 2010.  (Tr. 56.)

B.    Testimony of Vocational Expert

Jeffrey McGrosky, a vocational expert (VE), testified at the hearing in response to questions posed by the ALJ and counsel.

The VE classified plaintiff's past work as an assembler as light-to-medium and unskilled; as a janitor as light and unskilled; as a tree farm laborer as medium-to-heavy and unskilled; as a mechanic as heavy and semi-skilled; and as a supervisor at a cabinet shop as medium-to-heavy and skilled.  (Tr. 62-63.)

The ALJ asked the VE to assume an individual of plaintiff's age, education, and work experience who was able to perform a full range of work at the light exertional level except that he was limited to occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolding; frequently balancing; and occasionally stooping, kneeling, crouching, and crawling.  The ALJ further instructed that the person needed to avoid concentrated exposure to vibration and hazards, such as moving machinery and unprotected heights; and was limited to understanding, remembering, and carrying out simple instructions.  The VE testified that such a person could perform plaintiff's past relevant work as a janitor and as an assembler.  (Tr. 63.)

The ALJ then asked the VE to assume the same individual but that he was

limited to sedentary work and to only occasional balancing instead of frequent. The VE testified that such a person could not perform any of plaintiff's past relevant work. The VE testified that such a person could perform other work such as table worker, of which 500 such jobs exist in the State of Missouri and 20,000 nationally; surveillance system monitor, of which 300 such jobs exist in the State of Missouri and 10,000 nationally; and order clerk, of which 1,000 such jobs exist in the State of Missouri and 50,000 nationally. (Tr. 63-64.)

The ALJ then asked the VE to assume that the individual from the second hypothetical needed a sit-stand option to change positions every thirty minutes. The VE testified that such a person could continue to perform sedentary work as previously testified, but would be unable to perform any full time work if he continually needed to lie down for two hours during the workday. (Tr. 64-65.)

In response to counsel's question, the VE testified that an individual would be terminated from employment if he repeatedly missed at least three days of work each month. (Tr. 65.)

### III. Medical Evidence Before the ALJ

Plaintiff visited Dr. Glenn L. Gordon on July 11, 2008, who noted plaintiff's history of gastro esophageal reflux disease, posterior wall ulcers, erosive gastritis, reactive duodenitis, and hepatitis C virus (HCV) with stage I fibrosis. Dr. Gordon also reviewed a psychiatric evaluation that was unremarkable with no

recommended treatment noted.  A plan was put in place for treatment of plaintiff's

HCV with Ribavirin and PEG Intron, which plaintiff began on July 19.  (Tr. 281,

318-20.)

Blood tests dated July 27, August 10 and 28, 2008, yielded positive results

for the presence of HCV.  (Tr. 305, 308.)  On August 28, Dr. Gordon gave plaintiff

samples of Lexapro for mood swings, irritability, and anxiety, which were noted to

be side effects of HCV treatment.  It was also noted that plaintiff's current

medications included Darvocet.[1]  (Tr. 280-81, 317.)

Plaintiff visited Dr. Jeffrey Cramp at Montgomery City Medical Clinic

(MCMC) on September 8, 2008, with complaints regarding a possible spider bite.

Plaintiff also complained of depression and increased back and abdominal pain.

Plaintiff requested an analgesic.  Plaintiff was prescribed medication for the spider

bite as well as OxyIR[2] for pain.  Citalopram[3] was also prescribed.  Plaintiff was

---

[1] Darvocet is a combination narcotic analgesic used to relieve mild to moderate pain.  It is no longer available in the United States.  *Medline Plus* (last revised Mar. 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>; *Physicians' Desk Reference* 1207-08 (44th ed. 1999).

[2] Oxycodone is a narcotic analgesic marketed under the brand names Oxycontin and OxyIR.  Percocet is a brand name of a combination product of Oxycodone and Acetaminophen.  Oxycodone, whether prescribed alone or as a combination product, is used to relieve moderate to severe pain.  *Medline Plus* (last revised Sept. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

[3] Citalopram is used to treat depression.  *Medline Plus* (last revised May 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html>.

instructed to discontinue Lexapro. (Tr. 522.)

On October 16, 2008, plaintiff returned to Dr. Cramp and complained of increased low back pain. Plaintiff reported taking two or three Percocet at work and that he is tolerating the pain. Plaintiff requested that he be permitted to continue with Percocet until the completion of his HCV treatment. Plaintiff appeared to be in pain and moved about slowly. Tenderness to palpation was noted about the lumbosacral region, and limited range of motion was noted about the lumbosacral spine in all planes. Straight leg raising was negative. No muscle spasms were noted. Plaintiff was diagnosed with chronic low back pain and HCV under treatment. Plaintiff was prescribed Percocet. An MRI of the lumbar spine was discussed, however, plaintiff indicated that he wanted to wait. (Tr. 520.)

Plaintiff visited Dr. Gordon on November 24, 2008, who noted plaintiff's current medications to be Darvocet, Nexium, Peg Intron Redipen, milk thistle, Percocet, and an antidepressant prescribed by Dr. Cramp. It was noted that plaintiff failed to appear for a scheduled appointment on September 29, but reported in the interim that his irritability had improved. Plaintiff currently reported that his depression was stable and that he was having no problems. Plaintiff reported having chest or abdominal pain on the left side at a level five on a scale of one to ten, but that such pain appeared to be related to diet. Dr. Gordon noted plaintiff to be doing well overall and instructed him to return for follow up in

three months.  (Tr. 277-79.)

Plaintiff visited MCMC on December 1, 2008, for a refill of Percocet and for examination of a possible spider bite.  Plaintiff was diagnosed with cellulitis, and it was questioned whether MRSA was present.  Antibiotic ointment was prescribed. It was noted that Dr. Cramp was treating plaintiff's chronic pain condition.  (Tr. 519.)  Plaintiff's prescription for Percocet was refilled on December 9.  Plaintiff was also restarted on Lexapro for depression with instruction to discontinue Citalopram.  (Tr. 518.)

Plaintiff returned to Dr. Cramp at MCMC on December 23, 2008, who noted plaintiff to no longer be under treatment for HCV.  Plaintiff reported being depressed and having insomnia.  Plaintiff had been laid off from work.  Dr. Cramp prescribed Paxil[4] and Percocet as well as medication for sleep.  Dr. Cramp advised plaintiff that he could resume treatment for HCV and instructed plaintiff to follow up with Dr. Gordon.  (Tr. 516.)

An ultrasound of the abdomen taken on January 30, 2009, showed no abnormality of the liver.  (Tr. 315.)  An x-ray of the chest taken that same date in response to plaintiff's complaints of chest and abdominal pain, cough, and shortness of breath showed mild hyperinflation and osteopenia, but no focal

---

[4] Paxil is used to treat depression and other mental illnesses.  *Medline Plus* (last revised Feb. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html>.

infiltrate.  (Tr. 314.)

Plaintiff returned to Dr. Cramp on February 9, 2009, who noted that Dr. Gordon wanted to resume plaintiff's HCV treatment and continue such treatment for six to eight months once plaintiff was no longer taking Percocet.  Plaintiff requested that he be weaned from the medication.  Dr. Cramp noted plaintiff to have an anxious affect.  Plaintiff stated that he was okay with work.  Dr. Cramp diagnosed plaintiff with HCV, anxiety, and depression.  Plaintiff was prescribed Zyprexa[5] and was instructed to increase his dosage of Lexapro.  Percocet was also prescribed, and plaintiff was given a weaning schedule for the medication.  (Tr. 515.)

A bone density test performed on February 13, 2009, showed the possibility of bone density to be spuriously high in the lumbar spine due to the presence of significant degenerative disease which could result in bony sclerosis.  (Tr. 312.)

Blood tests in January and March 2009 yielded no detection of the HCV virus.  (Tr. 324-25, 332.)

On March 2, 2009, Dr. Cramp noted plaintiff to be doing better overall and continued to wean himself from Percocet.  Plaintiff complained of increased low back pain and anxiety.  Examination showed tenderness to palpation over the

---

[5] Zyprexa is used to treat the symptoms of schizophrenia and bipolar disorder.  *Medline Plus* (last revised Aug. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html>.

lumbosacral region with decreased range of motion of all planes. No spasms were noted. Dr. Cramp diagnosed plaintiff with anxiety, HCV, and chronic low back pain due to spondylosis. Hydroxyzine[6] and Meloxicam[7] were prescribed. Plaintiff was instructed to continue to wean himself from Oxycodone. (Tr. 514.) On March 9, Dr. Cramp noted plaintiff to be doing very well with weaning himself from Percocet, but that plaintiff complained of extreme anxiety. Plaintiff was instructed to stop drinking Mountain Dew soda, and Diazepam[8] was prescribed. (Tr. 513.)

Plaintiff returned to Dr. Cramp on March 17, 2009, and complained of severe low back pain and bilateral knee pain. Dr. Cramp instructed plaintiff to take three Percocet a day and suggested MRIs and x-rays, but plaintiff requested that such testing not be scheduled yet. Tenderness to palpation was noted about the lumbosacral spine and bilateral knees with decreased range of motion. Plaintiff was diagnosed with depression, knee arthralgia, chronic low back pain, HCV, and edema. Plaintiff was instructed to discontinue Zyprexa and Meloxicam.

---

[6] Hydroxyzine is used for anxiety and to treat symptoms of alcohol withdrawal. *Medline Plus* (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html>.

[7] Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Medline Plus* (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601242.html>.

[8] Diazepam, which is also marketed under the brand name Valium, is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal. *Medline Plus* (last reviewed Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html>.

Fluoxetine[9] and Percocet were prescribed, with instructions that plaintiff's significant other administer and monitor the medications.  (Tr. 512.)

On April 20, 2009, plaintiff requested that he be given a small amount of Percocet to help with his back pain, and Dr. Cramp instructed that plaintiff take such medication only as prescribed.  Dr. Cramp noted plaintiff to be anxious and in pain.  Plaintiff continued to work.  Physical examination showed tenderness to palpation about the thoracic and lumbosacral regions with decreased range of motion of all planes.  An MRI was ordered.  Plaintiff was diagnosed with chronic anxiety, chronic thoracic and low back pain with bilateral radiculopathy, and HCV.  Klonopin[10] and a stronger dosage of Percocet were prescribed.  (Tr. 511.)

An MRI of the lumbar spine dated April 28, 2009, showed mild chronic compression fracture at L3; circumferential disc bulge at L3-4 with extension into the right neural foramen and impingement on the right L3 nerve root in the neural foramen; and mild facet degenerative changes from L3-4 through L5-S1.  No central canal stenosis or left L3 nerve root impingement was noted.  Mild disc bulging at L4-5 and L5-S1 was also noted without central canal stenosis or focal nerve root impingement.  (Tr. 479-80.)  An MRI of the thoracic spine showed mild

---

[9] Fluoxetine is marketed under the brand name Prozac and is used to treat depression and other mental illnesses.  *Medline Plus* (last revised July 15, 2014)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a689006.html>.

[10] Klonopin is used to control certain types of seizures and to relieve panic attacks.  *Medline Plus* (last revised July 1, 2010)< http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

degenerative disc disease in the lower spine without focal disc bulge, central canal stenosis, or signal abnormality in the thoracic spinal cord. (Tr. 482.) Dr. Cramp noted the MRIs to show multilevel "BNP" of the lumbar spine. A lumbar epidural steroid injection was scheduled for June, and plaintiff's prescriptions for Percocet and Klonopin were refilled. (Tr. 510.)

On May 28, 2009, plaintiff reported to Dr. Cramp that work was going okay. Plaintiff reported that he was moody and anxious and that his medication did not work. Plaintiff was not in acute distress, but was noted to be in pain and to walk with an antalgic gait. Straight let raising was positive on the right at sixty degrees. Dr. Cramp diagnosed plaintiff with BNP at L4-5, L5-S1; facet arthropathy from L3-4 through L5-S1; and chronic low back pain due to degenerative disc disease of the thoracic spine and chronic L3 compression fracture. Plaintiff was prescribed Sertraline[11] and Percocet. Dr. Cramp suggested that plaintiff consider counseling, but plaintiff stated that he wanted to wait. (Tr. 509.)

Plaintiff visited MCMC on June 5, 2009, and was noted to be tearful, depressed, and unable to cope. Plaintiff reported having missed work at least one day a week during the previous month. Plaintiff reported being out of Percocet, having taken 100 tablets in one week. It was determined that plaintiff was addicted

---

[11] Sertraline, marketed under the brand name Zoloft, is used to treat depression and other mental illnesses. *Medline Plus* (last revised Apr. 13, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html>.

to narcotics.  Plaintiff was diagnosed with depression and anxiety with suicidal ideation, narcotic addiction, and chronic back pain and was taken to Audrain Medical Center for evaluation.  (Tr. 508.)

Plaintiff was admitted to Audrain Medical Center on June 5, 2009, for treatment of Percocet addiction, depression, and suicidal ideations.  Plaintiff reported having taken Percocet for the past year and recently taking five to fifteen tablets a day.  Plaintiff reported being prescribed Percocet, but that he was also buying the medication on the street.  It was noted that plaintiff was motivated to receive treatment for depression and addiction and was currently taking Zoloft and BuSpar.[12]  Mental status examination was unremarkable except plaintiff's mood was noted to be slightly depressed.  Physical examination was unremarkable.  Upon medication management and receipt of therapeutic services, plaintiff was discharged on June 8 in stable condition.  Plaintiff's discharge diagnosis was substance induced mood disorder with polysubstance dependence in early remission.  Plaintiff was prescribed Suboxone,[13] BuSpar, Zoloft, and Trazodone[14]

---

[12] BuSpar is used to treat anxiety disorders.  *Medline Plus* (last revised Apr. 15, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html>.

[13] Suboxone is used to treat opioid dependence, including addiction to narcotic painkillers. *Medline Plus* (last revised Nov. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a605002.html>.

[14] Trazodone is used to treat depression.  *Medline Plus* (last revised Jan. 15, 2014)<http://www. nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

upon discharge.  (Tr. 429-33, 450-52.)

Plaintiff visited Dr. Richard M. Wolkowitz on June 19, 2009, upon referral from Dr. Cramp for radiating back pain.  Plaintiff reported his pain to currently be at a level two.  Dr. Wolkowitz noted an MRI to show "disc degeneration at 4-5, 5-S1, and disc and facet degeneration and bulging disc of 3-4 with some right neural foraminal narrowing," as well as a chronic fracture of the L3 inferior endplate.  No stenosis was noted.  X-rays of the thoracic spine showed mild disc protrusion at T7-8 and a small disc protrusion at T11-12, which Dr. Wolkowitz opined may account for plaintiff's left-sided chest wall pain symptoms.  It was noted that plaintiff was weaned from Percocet through a detoxification program and was currently taking Suboxone with good results.  Plaintiff's other medications were noted to include Zoloft, BuSpar, and Trazodone.  Dr. Wolkowitz noted plaintiff to be very motivated and actively and gainfully employed.  Physical examination showed plaintiff to freely move all extremities.  Pain and tenderness was noted with extension and rotation of the lumbosacral spine.  Otherwise, there was no evidence of pain or tenderness over the facet joints, and straight leg raising was negative.  An epidural steroid injection was administered to the left L4-5, upon which plaintiff reported his pain to be at a level one.  (Tr. 403-06.)

On July 13, 2009, plaintiff reported to Dr. Cramp that he had run out of Suboxone, but that Dr. Perez, a psychiatrist, would not refill his prescription.

Noting plaintiff to have a follow up visit with Dr. Perez on July 22, Dr. Cramp stated that he would not refill the prescription. It was noted that plaintiff was not taking any analgesics. Plaintiff felt anxious and depressed and requested help. Plaintiff refused hospitalization. Dr. Cramp diagnosed plaintiff with depression and anxiety, as well as increased back pain due to other issues. Plaintiff was instructed to increase his dosage of BuSpar. (Tr. 507.) On August 13, Dr. Cramp noted an increase in muscle spasms to the thoracic region. Trigger points were also identified in the lumbosacral region. A trigger point injection with Depo Medrol was administered. Tramadol[15] was prescribed and Dr. Cramp requested plaintiff to consider inpatient treatment. (Tr. 506.) On September 3, Dr. Cramp prescribed Toradol.[16] (Tr. 505.)

Plaintiff visited Dr. Cramp on October 1, 2009, and reported that his back pain was unbearable. Plaintiff reported that trigger point injections provided no relief, and he requested that he be given a time-release analgesic. Plaintiff was advised that he would be monitored very closely with such medication. Plaintiff also requested treatment for anxiety. Plaintiff appeared to be in pain, and guarding

---

[15] Tramadol, also marketed under the brand name Ultram, is an extended release, narcotic analgesic used to relieve moderate to moderately severe pain for persons who need medication to relieve pain around-the-clock. *Medline Plus* (last revised Oct. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

[16] Toradol is an NSAID used to relieve moderately severe pain. *Medline Plus* (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html>.

was noted about the paralumbar region.  Decreased range of motion was noted in all planes.  Plaintiff was diagnosed with chronic low back pain, anxiety, HCV, and increased blood pressure probably due to pain.  Plaintiff was prescribed Oxycontin 10 mg and Hydroxyzine.  (Tr. 504.)

Plaintiff visited Dr. Cramp on October 22, 2009, who noted that plaintiff was compliant with and tolerating Oxycontin, but continued to be in significant pain.  Plaintiff continued to be without a job and insurance and was concerned about medical costs.  Plaintiff was observed to be in pain and ambulated in apparent distress.  Tenderness to palpation was noted along the lumbosacral spine with decreased range of motion in all planes because of pain.  Muscle spasms were also noted.  Straight leg raising was negative.  Plaintiff was diagnosed with chronic low back pain and undetectable HCV virus.  Plaintiff was prescribed Chlorzoxazone[17] for muscle spasms.  Plaintiff's dosage of Oxycontin was increased to 20 mg.  (Tr. 503.)

Plaintiff visited Associated Medical Arts on November 10, 2009, and requested that something be done for his back other than taking medication all of the time.  Plaintiff reported the pain to be in his low back, radiating down his right leg to the knee and that it was worsening.  Plaintiff reported the pain to be at a

---

[17] Chlorzoxazone is used to relieve pain and stiffness caused by muscle strains and sprains. *Medline Plus* (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682577.html>.

level eight or nine without medication and at a level four with medication.

Plaintiff reported the pain to be exacerbated with walking and lifting. Physical

examination showed range of motion to be decreased with flexion and extension.

Mild tenderness was noted about the low back, but examination of the back was

otherwise within normal limits. Dr. Michael T. Rothermich diagnosed plaintiff

with chronic low back pain with walking sciatica. Plaintiff declined an orthopedic

consultation because of lack of money, and it was noted that he could not afford

Oxycontin. Elavil[18] and Percocet 15/325 mg were prescribed. (Tr. 528.)

Plaintiff returned to Dr. Rothermich on January 28, 2010. Examination was

unchanged from the previous visit. It was noted that plaintiff was participating in

drug rehabilitation. Plaintiff was prescribed Tramadol and Elavil. (Tr. 569.) On

March 12, Dr. Rothermich noted plaintiff to have recently completed rehab and

that he was currently taking Trazodone and Tramadol for his conditions. Dr.

Rothermich instructed plaintiff to discontinue Trazodone. Elavil, Tramadol, and

Chlorzaxazone were prescribed. (Tr. 568.)

Plaintiff visited Dr. Rothermich on April 6, 2010, and reported that

medication did not help his anxiety. Plaintiff reported his back pain to be at a level

seven without medication, but at a level three or four with medication. Plaintiff

---

[18] Elavil is used to treat symptoms of depression. *Medline Plus* (last revised Aug. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html>.

reported the pain to be worse in the morning. BuSpar was prescribed and plaintiff was instructed to continue with Tramadol. (Tr. 567.)

On May 18, 2010, plaintiff continued to complain of left-sided pain, reporting it to be worsening and at a level nine. It was noted that BuSpar was plaintiff's only current medication. Dr. Rothermich prescribed Toradol and instructed plaintiff to take over-the-counter Aleve. (Tr. 566.) On May 27, Dr. Rothermich referred plaintiff to Dr. Swayze for consultation regarding plaintiff's left-sided pain, noted to now be radiating to the paralumbar area. (Tr. 565.)

Plaintiff visited Dr. Donald C. Swayze on June 8, 2010, for evaluation of left-sided pain that had radiated from the right. Plaintiff reported having the pain for about five weeks and that it was slowly improving. Dr. Swayze noted that plaintiff took ibuprofen for the pain and no other medications. Examination was mostly unremarkable with slight tenderness to the left side of the abdomen without guarding, rebounding, or rigidity. Dr. Swayze opined that the pain was consistent with musculoskeletal problems and recommended a muscle relaxant, which plaintiff declined because of his history of drug abuse. Dr. Swayze recommended that plaintiff continue with anti-inflammatory medication. (Tr. 570.)

Plaintiff was admitted to the emergency room at Hermann Area District Hospital on June 14, 2010, with complaints of left rib pain. Tenderness was noted about the left ribs. Examination of the back yielded normal results. Plaintiff had

- 21 -

normal range of motion of the extremities.  Plaintiff was given Toradol and was discharged that same date in improved and stable condition.  Upon discharge, plaintiff was diagnosed with fractured left rib and was instructed to take Tylenol or ibuprofen.  (Tr. 536-49.)

Plaintiff visited Dr. Rothermich on September 14, 2010, with complaints of increased left-sided pain with coughing.  Plaintiff was diagnosed with pneumonia and medication was prescribed.  Prozac was also prescribed for plaintiff's continued complaints of depression.  (Tr. 564.)

Plaintiff was admitted to the emergency room at Hermann Area District Hospital on September 16, 2010, with complaints of chest pain.  Plaintiff was given Demerol[19] and was discharged that same date in an improved and stable condition.  Upon discharge, plaintiff was diagnosed with costochondritis and was prescribed Darvocet.  (Tr. 550-56.)  Later that same date, Dr. Rothermich instructed plaintiff to take NSAIDs and Darvocet as prescribed.  (Tr. 563.)

Plaintiff visited Dr. Cramp at the Hannibal Clinic on September 30, 2010, and reported being very depressed, because he had been out of work for two years with the poor economy.  Plaintiff was apathetic, anhedonic, and had worsening insomnia.  Plaintiff reported that he generally felt bad and was concerned about a

---

[19] Demerol is a narcotic analgesic used to relieve moderate to severe pain. *Medline Plus* (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682117.html>.

possible recurrence of HCV.  Plaintiff also reported having generalized abdominal pain.  Dr. Cramp noted plaintiff to presently be taking no medication.  Diffuse tenderness was noted about the abdomen with palpation.  Mental status examination showed plaintiff's affect to be flat.  Dr. Cramp diagnosed plaintiff with depression, HCV, and abdominal pain.  Dr. Cramp suggested that plaintiff consider counseling or psychotherapy, but plaintiff stated he wanted to wait. Plaintiff was prescribed Citalopram and Tramadol.  Plaintiff was instructed to return for follow up in two weeks.  (Tr. 584-86.)

On November 11, 2010, plaintiff requested from Dr. Rothermich that he be permitted to take his pain medication again, because of increased back pain. Plaintiff reported the pain to be at a level six or seven.  Plaintiff was diagnosed with chronic low back pain and an acute exacerbation of chronic bronchitis. Meloxicam and Decadron, a corticosteroid, were prescribed.  (Tr. 562.)

Plaintiff returned to Dr. Cramp on November 23, 2010, and reported that his back pain was at a level ten after recently lifting a heavy object.  Plaintiff reported the pain did not radiate and he had no muscle spasms.  Plaintiff also complained of anxiety, but reported that taking Xanax[20] sparingly provided good relief.  Plaintiff made no other complaints.  Tenderness to palpation was noted about the lumbar

---

[20] Xanax is used to treat anxiety disorders and panic disorder.  *Medline Plus* (last revised Nov. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html>.

spine with decreased range of motion in all planes of motion. Straight leg raising was negative. Dr. Cramp diagnosed plaintiff with acute bronchitis, acute lumbar strain, and anxiety. Plaintiff was prescribed Xanax and Percocet 5/325 mg and was instructed to take over-the-counter ibuprofen. Plaintiff was also instructed to "avoid aggravators." (Tr. 587-89.)

On February 22, 2011, plaintiff visited Dr. Rothermich for treatment of a boil on his right arm. It was noted that plaintiff was taking no medications. No other complaints were noted. (Tr. 561.) Plaintiff followed up with Dr. Rothermich on February 25, at which time Zoloft was prescribed for depression. (Tr. 560.)

Plaintiff returned to Dr. Rothermich on March 11, 2011, with complaints of continued low back pain with bilateral sciatica radiating to the left heel. Plaintiff reported the pain to be at a level seven on most days with the pain worsening with bending over, walking, and prolonged standing. It was noted that plaintiff had taken Percocet for the pain and was buying Percocet from the street. Dr. Rothermich noted plaintiff's past addiction and his "very high risk" for opioid misuse. Dr. Rothermich noted plaintiff to have recovered with good compliance with detox and addiction programs. It was noted that an NSAID would have to be tried, and Meloxicam was prescribed. Dr. Rothermich recommended that plaintiff undergo additional MRIs and x-rays and consider possible surgery when he gets insurance. (Tr. 559.)

On March 15, 2011, plaintiff visited Dr. Cramp and complained that his back pain was at a level ten. Plaintiff reported his pain to worsen with movement of his lumbar spine. Plaintiff did not want intervention at the present time because of cost but reported that he would have Medicaid benefits soon. Plaintiff also reported anhedonia, apathy, and anxiety symptoms, but that Sertraline helped some. Plaintiff requested that the dosage be increased. Dr. Cramp noted plaintiff's current medications to be Clindamycin, Percocet, Sertraline, and Xanax. Examination showed plaintiff not to be in acute distress, but Dr. Cramp noted him to be uncomfortable and in pain. Tenderness to palpation was noted about the lumbar spine with decreased range of motion limited by subjective pain. Straight leg raising was positive bilaterally. Dr. Cramp diagnosed plaintiff with chronic low back pain with unknown etiology, depression, and anxiety. Plaintiff was prescribed Sertraline and Valium. Dr. Cramp increased plaintiff's dosage of Percocet from 5/325 mg to 10/325 mg. (Tr. 590-92.)

On April 21, 2011, plaintiff reported to Dr. Cramp that his back pain was at a level three with medication and that his anxiety was better with Valium. Physical examination showed continued tenderness about the lumbar spine, but straight leg raising was negative. Dr. Cramp diagnosed plaintiff with degenerative disc disease of the lumbar spine, HCV, and anxiety. Valium was prescribed, and x-rays and an MRI were ordered. Oxycodone 10mg was also prescribed, to be taken every six

hours.  (Tr. 618-20.)  On May 2, plaintiff reported doing fairly well on his current medications, with his pain at a level three.  Physical examination showed no change.  Plaintiff was continued on Oxycodone and Valium.  (Tr. 621-23.)

In a Psychiatric Review Technique Form completed May 10, 2011, for disability determinations, Joan Singer, Ph.D., opined that plaintiff's mental impairment was not severe inasmuch as it resulted in only mild limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace; and, further, resulted in no repeated episodes of decompensation of extended duration.  (Tr. 598-609.)

On May 17, 2011, plaintiff went to the emergency room at Hermann Area District Hospital complaining of having pain in his back, left hip, and leg for two days.  Plaintiff reported having the problem one month prior, but that it was recurring.  Plaintiff requested that he be given Toradol.  Plaintiff's medications were noted to include Valium, Zoloft, Wellbutrin,[21] Oxycodone, and Aleve. Physical examination showed plaintiff to be able to move all extremities and bend over and almost touch his toes with his legs straight.  Tenderness was noted about the abdomen.  A CT scan of the lumbar spine showed some degenerative changes mostly L3-4; right-sided bridging osteophyte; and bulging discs at L4-5 and L5-S1.

---

[21] Wellbutrin is used to treat depression.  *Medline Plus* (last revised Sept. 15, 2013)<http://www. nlm.nih.gov/medlineplus/druginfo/meds/a695033.html>.

A CT scan of the pelvis showed left sided sacroiliac joint degenerative changes manifested by fairly significant anterior and superior osteophyte. Plaintiff was given Toradol and Tramadol and was discharged that same date in improved and stable condition. Ultram was prescribed upon discharge, and plaintiff was instructed to engage in activity as tolerated. (Tr. 661-71.)

Plaintiff returned to Dr. Cramp on May 26, 2011, who noted recent diagnostic testing to show BNP L4-5 and L5-S1 with right-sided bridging osteophyte. Plaintiff currently complained of low back pain radiating down the right leg. Plaintiff reported no other symptoms. Plaintiff rated his pain to be at a level three with medication. Straight leg raising was positive on the right. Plaintiff also reported doing well with his anxiety, and Dr. Cramp noted the condition to be controlled with Valium. Plaintiff was continued on his medications. (Tr. 624-26.) On June 16, plaintiff reported that Oxycodone no longer provided adequate relief. Plaintiff reported his pain to be at a level six with medication. Tenderness was noted about the lumbar spine with decreased range of motion. Straight leg raising was positive on the right. Plaintiff was instructed to discontinue Oxycodone, and Dilaudid[22] was prescribed. Plaintiff was also continued on Valium. (Tr. 627-29.)

---

[22] Dilaudid (hydromorphone) is an extended-release, narcotic analgesic used to relieve pain in only those people who are opioid tolerant who need medication to relieve moderate to severe pain around-the-clock for longer than a few days. *Medline Plus* (last revised Aug. 15, 2013) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682013.html>.

Plaintiff returned to Dr. Cramp on July 18, 2011, and reported doing well with his current medications. His pain was currently at a level two. It was noted that plaintiff had applied for disability. Straight leg raising was negative. Otherwise, physical examination was unchanged. Dr. Cramp recommended an epidural steroid injection, but plaintiff stated he wanted to wait because a previous injection did not help. Plaintiff was continued on Valium, and Oxycodone 10 mg was prescribed. (Tr. 630-32.) On August 4, plaintiff reported his pain to be at a level five, but asked that he be continued on Oxycodone since he tolerates the medication well. Dr. Cramp diagnosed plaintiff with chronic pain syndrome and anxiety. Plaintiff was instructed to discontinue OxyIR, and Oxycontin 40 mg was prescribed. Plaintiff's prescription for Valium was also refilled. (Tr. 633-35.)

On August 26, 2011, plaintiff visited Dr. Cramp and complained of increased back pain with no provocative factors. Plaintiff reported his pain to currently be at a level seven with medication. Plaintiff also reported that the Valium was no longer as effective as it had been. Physical examination was unchanged. Plaintiff's dosage of Oxycontin was increased to 60 mg. Plaintiff was also instructed to discontinue Valium, and Ativan[23] was prescribed. (Tr. 636-38.) On September 20, plaintiff reported to Dr. Cramp that Oxycontin provided only

_____

[23] Ativan is used to relieve anxiety. *Medline Plus* (last revised Oct. 1, 2010)<http://www.nlm. nih.gov/medlineplus/druginfo/meds/a682053.html>.

temporary pain relief and that Ativan was not effective for his anxiety. A psychiatry referral was made, and Xanax was prescribed. Plaintiff's prescription for Oxycontin was adjusted to 40 mg every eight hours instead of 60 mg every twelve hours as previously prescribed. (Tr. 639-41.)

On October 13, 2011, plaintiff continued to complain of significant back pain at a level seven with medication. Plaintiff also complained of intermittent heart palpitations with no known cause. Physical examination was unchanged. Plaintiff's dosage of Oxycontin was increased to 60 mg every eight hours. Plaintiff was also prescribed Ativan, and a holter monitor was provided. (Tr. 642-44.) On November 8, plaintiff's pain was at a level two. Plaintiff was prescribed Xanax, and his dosage of Oxycontin was reduced to 40 mg. (Tr. 645-47.)

In a letter to plaintiff's counsel dated November 15, 2011, Dr. Cramp wrote:

I have known and provided primary medical care to Mr. Penn for at least the past ten years. His diagnoses include bulging discs at three disc levels of his lumbar spine including L3-4, L4-5 and L5-S1 discs with bilateral foraminal stenosis and facet joint arthropathy. He has chronic daily incapacitating low back pain with radiation of the pain down both legs. He has been and continues to be appropriately medically treated. Unfortunately he continues to have severe debilitating and incapacitating pain in his lumbar spine and down his bilateral legs which has caused him to be medically incapable of holding gainful employment since 7-01-09. He also suffers from Depression and Anxiety which have been responsive to treatment. He has been infected with the Hepatitis C virus and he has completed treatment for that.

In my medical opinion and to a reasonable degree of medical

certainty, I believe Mr. Penn has been medically incapable of holding gainful employment since 7-01-09 and will be for at least the next twelve months and into the foreseeable future.

(Tr. 617.)

On November 22, 2011, plaintiff reported to Dr. Cramp that he had worsening pain and sleep difficulties. Physical examination remained unchanged. Dr. Cramp prescribed Nortriptyline[24] and Xanax and increased plaintiff's dosage of Oxycontin to its previous level. (Tr. 648-50.) On December 15, plaintiff continued to complain that his pain was not adequately controlled. Plaintiff also reported that Nortriptyline caused nausea. Physical examination showed tenderness to palpation about the lumbar spine with decreased range of motion limited in all planes by pain. No muscle spasms were noted, and straight leg raising was negative. Plaintiff's dosage of Oxycontin was increased to 80 mg, and Temazepam was prescribed for sleep. Ativan was prescribed for anxiety, and plaintiff was referred to psychiatry. An epidural steroid injection was scheduled. (Tr. 651-53.)

Plaintiff returned to Dr. Cramp on January 12, 2012, and reported that he was doing well on his current medications and that his pain was at a level two. It was noted that plaintiff never underwent the epidural injection. Physical

---

[24] Nortriptyline is used to treat depression. *Medline Plus* (last revised Feb. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html>.

examination was unchanged. Plaintiff was prescribed Meloxicam, Oxycontin 80 mg, OxyIR 10 mg, Temazepam, and Xanax. (Tr. 654-56.) Plaintiff continued to be doing fairly well on February 3, and reported that a recent steroid injection helped some. Physical examination was unchanged. A second injection was scheduled, and plaintiff was prescribed Oxycontin 60 mg, OxyIR 10 mg, Xanax, and Temazepam, Plaintiff was also instructed to continue with his present therapy otherwise, which included taking Meloxicam. (Tr. 657-59.)

In a letter to plaintiff's counsel dated March 23, 2012, Dr. Cramp wrote that plaintiff's medical condition was unchanged and had not improved. Dr. Cramp further wrote that

> Mr. Penn has to lie down at least two hours a day due to back pain. I believe if he had a job he would have to miss at least three days a month due to back pain. My medical opinion remains the same as noted in my 11-15-11 letter to you.

(Tr. 672.)

## IV. The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through December 31, 2014. The ALJ found plaintiff not to have engaged in substantial gainful activity since February 16, 2010, the amended onset date of disability. The ALJ found plaintiff's degenerative disc disease of the lumbar spine, HCV with accompanying abdominal pain, chronic pain syndrome,

and obesity to be severe impairments, but that such impairments, either singly or in combination, did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11-12.) The ALJ found plaintiff to have the residual functional capacity (RFC) to perform light work[25] with the following limitations:

> occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; can frequently balance; and can occasionally stoop, kneel, crouch, and crawl. He should avoid concentrated exposure to vibration and hazards, such as moving machinery and unprotected heights. The claimant is able to understand, remember, and carry out simple instructions.

(Tr. 14.) The ALJ found vocational expert testimony to support a finding that plaintiff's RFC did not preclude the performance of his past relevant work as a janitor and as an assembler as the work is generally performed. Given plaintiff's RFC ability to perform his past relevant work, the ALJ found plaintiff not to be under a disability from February 16, 2010, through the date of the decision. (Tr. 20-21.)

## V. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.

---

[25] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920 (2012); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the

impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's

impairment(s) is equivalent to one of the listed impairments, he is conclusively

disabled.  At the fourth step, the Commissioner establishes whether the claimant

can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the

Commissioner evaluates various factors to determine whether the claimant is

capable of performing any other work in the economy.  If not, the claimant is

declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by

substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir.

2002).  Substantial evidence is less than a preponderance but enough that a

reasonable person would find it adequate to support the conclusion.  *Johnson v.*

*Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the

Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted).  "Substantial evidence on the

record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation

marks and citations omitted).

To determine whether the Commissioner's decision is supported by

substantial evidence on the record as a whole, the Court must review the entire

administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex*

*rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

In this action for judicial review, plaintiff claims that the ALJ erred by according limited weight to the medical opinions rendered by his treating physician, Dr. Cramp. For the following reasons, plaintiff's argument is well taken.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical

findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  However, a medical source's opinion that an applicant is unable to work involves an issue reserved for the Commissioner and is not the type of opinion which the Commissioner must credit. *Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

In his written decision here, the ALJ accorded little weight to Dr. Cramp's November 2011 and March 2012 opinions, noting first that Dr. Cramp's statement that plaintiff was incapable of work was a matter reserved to the Commissioner. The ALJ also discounted Dr. Cramp's opinions for the reasons that they were

incongruent with his own treatment notes, inconsistent with plaintiff's own statement regarding his inability to work, and unsupported by objective evidence that demonstrated plaintiff's condition not to have significantly worsened from the time he engaged in heavy work. (Tr. 19.) While the ALJ properly disregarded Dr. Cramp's statements on the ultimate question of plaintiff's employability, *Ellis*, 392 F.3d at 994-95, the additional bases upon which the ALJ determined to accord little weight to Dr. Cramp's opinions are not supported by substantial evidence on the record as a whole and do not constitute good reasons under the Regulations. The matter will therefore be remanded to the Commissioner for further proceedings, including for further development of the record as to plaintiff's functional abilities.[26]

First, the ALJ accorded Dr. Cramp's opinions little weight for the reason that his statements were incongruent with his own treatment notes, specifically finding that Dr. Cramp's examinations of plaintiff "failed to yield objective findings suggestive of a persistent strength, reflex, motor, or sensory deficit." (Tr. 19.) A review of the medical record *in toto*, however, shows that between October 2008 and February 2012, Dr. Cramp repeatedly and consistently made objective findings on physical examination that plaintiff exhibited tenderness to palpation

---

[26] Although the ALJ properly discounted Dr. Cramp's statements that plaintiff was incapable of employment, he could not disregard Dr. Cramp's opinions on this basis alone given that such opinions were only part of a larger medical record supplied by Dr. Cramp. *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003).

about the lumbosacral region and exhibited limited range of motion about the lumbosacral spine. Muscle spasms were observed on occasion, as well as plaintiff's abnormal gait and positive straight leg raising. Indeed, such observations are consistent with findings made by Dr. Wolkowitz in June 2009 that plaintiff experienced pain and tenderness with range of motion about the lumbosacral spine, as well as findings made by Dr. Rothermich in November 2009 that plaintiff exhibited tenderness and decreased range of motion.

Persistent, reproducible muscle tenderness on repeated examinations is a recognized example of a medical sign that constitutes objective evidence under the Regulations. *See Miller v. Barnhart*, 293 F. Supp. 2d 1009, 1010 (W.D. Mo. 2003) (citing *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001)). *See also* 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1) (objective medical evidence includes medical signs as defined in §§ 404.1528(b), 416.928(b)); 20 C.F.R. §§ 404.1528(b), 416.928(b) (signs are anatomical or physiological abnormalities that can be observed apart from a claimant's symptoms). Objective medical evidence likewise includes reduced joint motion as well as muscle spasm and motor disruption. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *Cherico v. Colvin*, No. 12 Civ. 5734 (MHD), 2014 WL 3939036, at *25 (S.D.N.Y. Aug. 7, 2014). In addition, a consistent diagnosis of chronic back pain, coupled with a long history of pain management and drug therapy, is an objective medical fact evidencing pain. *Cox v. Apfel*, 160

F.3d 1203, 1208 (8th Cir. 1998). Given that the record shows Dr. Cramp to have repeatedly recorded objective findings of persistent deficits, consistently diagnosed plaintiff with chronic back pain, and consistently prescribed significant dosages of narcotic pain medication over a period of years, it cannot be said that substantial evidence supports the ALJ's determination that Dr. Cramp's treatment records yielded no objective findings consistent with his opinions regarding the level of plaintiff's pain.

In addition, the ALJ accorded limited weight to Dr. Cramp's opinions on account of plaintiff's statement in September 2010 that he was becoming increasingly depressed, having been out of work for two years with "the poor economy." (Tr. 19.) While the Commissioner argues that this statement demonstrates that plaintiff stopped working for reasons other than his alleged disability and is thus relevant to the credibility of plaintiff's subjective complaints (Deft.'s Brief, Doc. #29 at p. 8), the undersigned is reluctant to extrapolate this argument to find that such an isolated statement is sufficient in the circumstances of this case to discount the treating physician's opinion regarding the level of plaintiff's pain and his physical ability to perform work-related activities. This is especially true here given the substantial longitudinal evidence on the record as a whole that objectively demonstrates the effects of plaintiff's physical impairment, including at the time he was let go from his job which coincided with him no

longer being able to take narcotic medication for pain.  *Cf. Cox*, 160 F.3d at 1208.

Finally, the ALJ discounted Dr. Cramp's opinions because "there is little objective evidence to suggest a significant worsening of the claimant's conditions from the time period that he was still working at the heavy exertional level."  (Tr. 19.)  For the following reasons, this limited and narrow view of the record does not constitute a good reason to accord little weight to Dr. Cramp's opinions.

At the time plaintiff was performing heavy work as a cabinet maker in a supervisory capacity, he was taking significant narcotic pain medication for his back impairments, which had been medically determined by diagnostic tests as disc bulges in the lumbar spine, the lumbosacral spine, and the thoracic spine as well as nerve root impingement and compression fracture of a lumbar disc.  During the spring of 2009, plaintiff attempted to wean himself from this narcotic medication so that he could resume HCV treatment, but his persistent need for pain relief resulted in Dr. Cramp's continued – but limited – prescriptions for such medication and, ultimately, plaintiff buying it from street dealers and his overuse of it.  In June 2009, plaintiff underwent inpatient detoxification for his addiction to narcotic painkillers.  After being released from this detoxification program and beginning treatment without narcotic pain relievers, plaintiff was let go from his job.  As such, while the ALJ is correct that plaintiff was able to perform heavy work with his impairment, the record shows that he did so while addicted to

narcotic pain medication. "[A]ddiction is not effective control of pain." *Saleem v. Chater*, 86 F.3d 176, 180 (10th Cir. 1996) (internal quotation marks omitted).

Within two months of his detoxification, plaintiff was again begun on a regimen of narcotic painkillers given his increased pain without such medication and objective findings of increased muscle spasms, trigger points, and decreased range of motion. With continued and increased pain that was radiating to the lower extremities, the dosages of plaintiff's narcotic painkillers were increased until plaintiff underwent another detoxification program, which he successfully completed in March 2010. After his appointment with Dr. Rothermich in April 2010, plaintiff was no longer regularly prescribed narcotic painkillers, but was instead prescribed anti-inflammatory medication. In fact, plaintiff declined an offered prescription for a muscle relaxant in June 2010 given his history of addiction. Plaintiff asked Dr. Rothermich in November 2010, however, to allow him to take pain medication again given his increased back pain. Although Dr. Rothermich continued to prescribe an NSAID, Dr. Cramp provided a limited prescription of Percocet at that time. Thereafter, and specifically in March 2011, Dr. Cramp resumed prescribing narcotic painkillers as plaintiff's regular treatment regimen, which continued through the time of the administrative hearing in this cause. Notably, the dosage of these painkillers steadily increased with plaintiff's corresponding complaints of increasing pain.

Despite substantial evidence of plaintiff's long term use of significant narcotic pain medication, including evidence of plaintiff's addiction and treatment to said medications, the ALJ wholly failed to address this evidence and instead described plaintiff's treatment regimen as "conservative measures" that "have been generally effective in managing his back condition." (Tr. 17.) As demonstrated above, however, this "effective management" of plaintiff's back pain consisted of ever-increasing levels of habit-forming narcotic painkillers to which plaintiff was previously addicted, including addiction when he previously worked.[27] A social security claimant's ability to work while addicted to narcotic pain medication does not serve as evidence that he can presently perform work-related activities, especially in view of evidence demonstrating his continued need for such medication at continually increasing levels. *Saleem*, 86 F.3d at 179-80 ("The net result of the ALJ's decision is that [claimant] is to return to work, addicted, because her drug abuse will keep her from feeling severe pain.").

With this narrow view of the record and the limited treatment of Dr. Cramp's opinions, the ALJ essentially determined that plaintiff could return to

---

[27] To the extent the ALJ refers to the period from March to November 2010 to show plaintiff's non-deteriorating condition, stating that plaintiff sought no treatment for his back condition during this time, the record shows to the contrary in that plaintiff complained of and received treatment for left-sided pain that radiated to the paralumbar area. While plaintiff received limited *narcotic* pain relief during this period, he should not be faulted for avoiding addictive medication given his history of abuse. *See Davis v. Astrue*, 545 F. Supp. 2d 973, 987-88 (D. Neb. 2008); *cf. Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir. 1993) (ALJ failed to note that claimant was unable to take narcotic pain medication because of his former addiction).

work given that his condition had not worsened since when he was addicted to painkillers.  As noted above, however, the ALJ failed to acknowledge the increasing dosages of narcotic painkillers as prescribed by Dr. Cramp and thus failed to consider whether such increased dosages indicate a worsening of plaintiff's impairment.  In light of this evidence, the ALJ's declaration that there had been no significant worsening of plaintiff's condition – without any explanation or discussion regarding the increased dosages of pain medication – is not a good reason upon which to discount Dr. Cramp's opinions.  *See McNeil v. Astrue,* No. 4:10 CV 2305 DDN, 2011 WL 2621705, at *11 (E.D. Mo. July 5, 2011); *see also McNeil v. Colvin,* No. 4:12CV1772 CDP, 2014 WL 4055363, at *6 (E.D. Mo. Aug. 15, 2014).

Accordingly, the reasons given by the ALJ to discount the opinions of plaintiff's treating physician are not supported by substantial evidence on the record as a whole.  Because the opinion of a treating physician is accorded special deference under the Regulations and is normally entitled to great weight, the ALJ on remand must reconsider the weight given to the opinions of Dr. Cramp in light of the totality of the evidence of record.  *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010).  Inasmuch as an ALJ's RFC assessment must be based on some medical evidence of the claimant's ability to function in the workplace and must discuss and describe how such evidence supports each RFC conclusion, *id.* at

1016; *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001); Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996), the ALJ is encouraged upon remand here to recontact Dr. Cramp for a functional assessment of how plaintiff's impairments affect his ability to engage in specific work-related activities. *See Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002).

In addition, because the ALJ found that plaintiff's pain was "effectively controlled" with addictive narcotic painkillers without regard to plaintiff's past addiction to such painkillers, continued susceptibility to addiction, and the presently increasing level of narcotic prescriptions, he is encouraged upon remand to consider the addictive quality of this medication that represents a significant potential side effect to plaintiff. *See Krowiorz v. Barnhart*, No. C04-3032-MWB, 2005 WL 715930, at *24 (N.D. Iowa Mar. 30, 2005). If, upon consideration of all of the effects of plaintiff's symptoms, regardless of cause, the ALJ finds plaintiff disabled, the ALJ shall determine whether the evidence of record requires him to invoke 20 C.F.R. §§ 404.1535, 416.935 to assess whether addiction is material to the finding of disability. The undersigned notes, however, that "[i]t is Congressional policy that the social security laws not be applied to perpetuate drug addiction." *Saleem*, 86 F.3d at 179 (citing 142 Cong. Rec. S3114-02, S3119 (daily ed. Mar. 28, 1996) (statement of Sen. Roth)). As such, claimants should not be encouraged to return to work addicted to narcotic painkillers where such addiction

is what keeps them from feeling severe pain. *Id.* at 179-80.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of September, 2014.